**GERYVILLE MATERIALS, INC., Appellant**

v.

**PLANNING COMMISSION OF LOWER MILFORD TOWNSHIP, LEHIGH COUNTY, Pennsylvania.**

Commonwealth Court of Pennsylvania.

Argued March 11, 2013.

Decided July 30, 2013.

Stephen B. Harris, Warrington, for appellant.

Patrick M. Armstrong, Perkasie, for appellees Don Weinberg and Lori Weinberg.

David M. Backenstoe, Hellertown, for appellee Planning Commission of Lower Milford Township.

Mark S. Cappuccio, Doylestown, for appellees Lower Milford Township and Planning Commission of Lower Milford Township.

BEFORE: LEADBETTER, Judge, COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Geryville Materials, Inc. appeals an order of the Court of Common Pleas of Lehigh County (trial court) that affirmed the Lower Milford Township Planning Commission's disapproval of Geryville's preliminary plan to develop a stone quarry. Geryville argues that the trial court and the Planning Commission erred in their construction and application of the applicable ordinances. We reverse and remand.

Geryville owns land in Lower Milford Township. On June 18, 2009, Geryville submitted a preliminary plan to the Planning Commission that described Geryville's plan to develop a stone extraction quarry on 84.56 acres of its 628.48–acre property. Geryville proposed to locate its quarry on the north side of West Mill Hill Road and the quarry's water infiltration facilities [1] on the other side of this road.

---

1. The infiltration system is "a pipe coming from the quarry to a settlement basin which basically settles out the sediments and then ultimately goes into the infiltration gallery which is a network of piping configured so that the water moves through the pipes and then ultimately down through the soil into the bedrock." Notes of Testimony, May 2, 2011, at 50 (N.T. ____); Reproduced Record at 174a (R.R. ____). Its purpose is to pump water from the quarry and direct it back into the

Between 2009 and 2011, the Planning Commission conducted 20 hearings on Geryville's preliminary plan.

Lower Milford Township opposed the approval of Geryville's preliminary plan and offered several witnesses to support its opposition. Val Britton, a geologist, opined that Geryville's proposed water infiltration system would be insufficient to manage the water generated by the quarry and this would lead to damage of the wetlands on the property. Mark Gallagher, a wetlands expert, testified that the quarry would increase stormwater runoff that could adversely affect both wetlands and woodlands on the property. Charles Schmehl, a community planner, testified that Geryville's preliminary plan was defective because it did not subtract noncontiguous land, i.e., land separated by a road from the remainder of the parcel, when it calculated the buildable site area. He also opined that Geryville's preliminary plan did not propose a proper building envelope.[2]

On October 3, 2011, the Planning Commission voted unanimously to reject Geryville's preliminary plan. Nevertheless, the Planning Commission also listed the conditions that it would have imposed had it approved Geryville's preliminary plan. The Planning Commission rejected Geryville's preliminary plan for three reasons. First, it held that Geryville erred in considering its 84.56–acre property as one parcel when it did its site capacity calculations because the parcel is actually divided into three parcels by public roads. Second, it held that Geryville proposed an impermissible partial preliminary plan because the plan addressed only 84.56 acres of its total parcel of 628 acres. Third, it held that Geryville's preliminary plan did not comply with the natural resource provisions of the Zoning Ordinance that preserve woodlands, watercourses and wetlands. To reach these three conclusions, the Planning Commission relied upon the Township's expert witnesses.

Geryville appealed to the trial court.[3] Geryville argued that the natural resource provisions of the Zoning Ordinance cited by the Planning Commission were preempted by the Pennsylvania Noncoal Surface Mining Conservation and Reclamation Act (Mining Act).[4] Under the Mining Act, the Pennsylvania Department of Environmental Protection has exclusive authority to regulate the operation of noncoal surface mining. Geryville also argued that the Planning Commission erred in concluding that Geryville's property consisted of three separate parcels because a two-lane public road does not interfere with common use of its 84.56 acres. Geryville further argued that the Planning Commission did not act in good faith because it offered no guidance, and it refused to allow Geryville to make clarifying amendments to its preliminary plan. Finally, Geryville challenged the holding that its preliminary plan could be construed a partial plan when it has no present plans for all 628 acres of its property. The trial court affirmed the Planning Commission.

ground, without damaging the stream or the surface of the ground. N.T. 49; R.R. 173a.

2. Other evidence was presented over the course of the 20 hearings, but the Township's expert testimony is the evidence relied upon by the Planning Commission and the trial court on the critical question of whether the quarry's operations would violate the natural

resource provisions of the Township's Zoning Ordinance.

3. The trial court did not take additional evidence.

4. Act of December 19, 1984, P.L. 1093, as amended, 52 P.S. §§ 3301–3326.

With respect to preemption, the trial court noted that the case law differentiates local ordinances that directly regulate the operation of mines and those that regulate where the regulated activity can take place. Only the former are preempted, as was established in *Pennsylvania Coal Company, Inc. v. Township of Conemaugh*, 149 Pa.Cmwlth. 22, 612 A.2d 1090, 1092 (1992). The trial court concluded that the natural resource provisions of the Zoning Ordinance did not regulate the operation of Geryville's proposed quarry. The trial court next rejected Geryville's claim that its proposal related to one parcel, not three, because the Zoning Ordinance defined a "lot" as "[a] parcel of land held in one ownership not divided by a street." LOWER MILFORD TOWNSHIP, ZONING ORDINANCE (1997), § 960 (ZONING ORDINANCE); R.R. 65a. Finally, the trial court

held that the evidence did not support Geryville's claim of bad faith, and it declined to rule on Geryville's challenge to the Planning Commission's "partial land development" conclusion, noting that the court must affirm a denial if even one cited reason has merit. *Herr v. Lancaster County Planning Commission*, 155 Pa. Cmwlth. 379, 625 A.2d 164, 168–69 (1993). Geryville then appealed to this Court.[5]

On appeal, Geryville raises five issues. First, it argues that the Planning Commission construed the natural resource provisions in the Zoning Ordinance to mean that the Township could regulate the operations of its proposed quarry. Such regulation is preempted under Section 603 of the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. § 10603(b).[6]

---

5. In a land use appeal, where the trial court does not take any additional evidence, our review is limited to whether the local governing body committed an error of law or an abuse of discretion. *Weiser v. Latimore Township*, 960 A.2d 924, 929 n. 9 (Pa.Cmwlth. 2008). An abuse of discretion occurs when the governing body's findings are not supported by substantial evidence. *Id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lantos v. Zoning Hearing Board of Haverford Township*, 153 Pa.Cmwlth. 591, 621 A.2d 1208, 1211 (1993).

6. Section 603(b) of the MPC provides as follows:

Zoning ordinances, except to the extent that those regulations of mineral extraction by local ordinances and enactments have heretofore been superseded and preempted by the act of May 31, 1945 (P.L. 1198, No. 418), known as the "Surface Mining Conservation and Reclamation Act," the act of December 19, 1984 (P.L. 1093, No. 219), known as the "Noncoal Surface Mining Conservation and Reclamation Act," and the act of December 19, 1984 (P.L. 1140, No. 223), known as the "Oil and Gas Act," and to the extent that the subsidence impacts of coal extraction are regulated by the act of April 27, 1966 (1st Sp. Sess., P.L. 31,

No. 1), known as "The Bituminous Mine Subsidence and Land Conservation Act," and that regulation of activities related to commercial agricultural production would exceed the requirements imposed under the act of May 20, 1993 (P.L. 12, No. 6), known as the "Nutrient Management Act," regardless of whether any agricultural operation within the area to be affected by the ordinance would be a concentrated animal operation as defined by the "Nutrient Management Act," the act of June 30, 1981 (P.L. 128, No. 43), known as the "Agricultural Area Security Law," or the act of June 10, 1982 (P.L. 454, No. 133), entitled "An act protecting agricultural operations from nuisance suits and ordinances under certain circumstances," or that regulation of other activities are preempted by other Federal or State laws may permit, prohibit, regulate, restrict and determine:

(1) Uses of land, watercourses and other bodies of water.

(2) Size, height, bulk, location, erection, construction, repair, maintenance, alteration, razing, removal and use of structures.

(3) Areas and dimensions of land and bodies of water to be occupied by uses and structures, as well as areas, courts, yards, and other open spaces and dis-

Second, even assuming, *arguendo*, that these provisions in the Zoning Ordinance are not preempted, Geryville argues that the Planning Commission's critical factual findings, *i.e.*, that Geryville's proposed water control systems will fail and degrade the woodlands and wetlands on its property, are not supported by substantial evidence. Third, Geryville asserts that its property is a single parcel for the purposes of doing the site capacity calculations, regardless of the existing public roads. Fourth, Geryville argues that it did not propose a "partial" land development plan; it seeks approval for its development of 84.56 acres and not for the remainder of the property it happens to own. Finally, Geryville argues that the trial court erred in concluding that the Planning Commission acted in good faith.

We begin with the issue of preemption. When an ordinance regulates the operations of a surface mine, it goes beyond the purview of traditional land use controls. Section 16 of the Mining Act provides as follows:

> Except with respect to ordinances adopted pursuant to the act of July 31, 1968 (P.L. 805, No. 247), known as the Pennsylvania Municipalities Planning Code, all local ordinances and enactments purporting to regulate surface

mining are hereby superseded. The Commonwealth, by this enactment, hereby preempts the regulation of surface mining as herein defined.

52 P.S. § 3316.[7] The Zoning Ordinance provisions preserve natural resources, but Geryville contends that the Planning Commission construed those provisions in a way that covers the operation of the quarry, an activity the Township cannot regulate.

The Planning Commission responds, *inter alia*, that the Zoning Ordinance natural resource provisions apply to all applicants, not just those proposing a surface mine. The Township notes that in *Arbor Resources, LLC v. Nockamixon Township*, 973 A.2d 1036, 1046 (Pa.Cmwlth.2009), this Court held that land preservation is a proper subject of zoning. Provisions on lot size, proximity to endangered species or crucial habitations, and requirements of environmental reports are all traditional land use controls. Further, the Township's evidence concerned Geryville's proposed groundwater management, not the efficacy of Geryville's water infiltration system.

*Arbor Resources* involved the construction of the 1984 Pennsylvania Oil and Gas Act, which has since been repealed.[8] The

---

tances to be left unoccupied by uses and structures.

(4) *Density of population and intensity of use.*

(5) Protection and preservation of natural and historic resources and prime agricultural land and activities.

53 P.S. § 10603(b).

**7.** The definition of surface mining includes:

The extraction of minerals from the earth, from waste or stockpiles or from pits or from banks by removing the strata or material that overlies or is above or between them or otherwise exposing and retrieving them from the surface, including, but not limited to, strip mining, auger mining,

dredging, quarrying and leaching and all surface activity connected with surface or underground mining, including, but not limited to, exploration, site preparation, entry, tunnel, drift, slope, shaft and borehole drilling and construction and activities related thereto; but it does not include those mining operations carried out beneath the surface by means of shafts, tunnels or other underground mine openings.

Section 3 of the Mining Act, 52 P.S. § 3303.

**8.** Act of December 19, 1984, P.L. 1140, *as amended*, 58 P.S. §§ 601.101–601.605; *repealed and replaced by* the Act of February 14, 2012, P.L. 87, No. 13, 58 Pa.C.S. §§ 2301–3504 (58 Pa.C.S. § 3304 declared unconstitu-

1984 Oil and Gas Act prohibited local ordinances from

> contain[ing] provisions which impose conditions, requirements or limitations on the same features of oil and gas well operations regulated by this act or that accomplish the same purposes as set forth in this act. The Commonwealth, by this enactment, hereby preempts and supersedes the regulation of oil and gas wells as herein defined.

Section 602 of the 1984 Oil and Gas Act, 58 P.S. § 601.602. At issue in *Arbor Resources* was a zoning ordinance that established setback and lot size requirements; limited development that would impact endangered species; and required the submission of a wetland report. The question before this Court was whether these provisions were preempted by the 1984 Oil and Gas Act. We noted the precedent that draws a line between regulation of land use and regulation of operations. We stated:

> [S]tatutory and judicial distinctions [are made] between ordinance provisions governing *where* the location of the facility may be (zoning provisions) and, on the other hand, *how* it may be technically designed and operated (operational regulations).

*Arbor Resources,* 973 A.2d at 1043 (quoting Plymouth *Township v. Montgomery County,* 109 Pa.Cmwlth. 200, 531 A.2d 49, 50 (1987)) (emphasis in original). We also explained that zoning ordinances "that become pertinent only after land use approval is granted" were likely to be ordinances that regulate operations, not land use. *Arbor Resources,* 973 A.2d at 1046. Based on the foregoing principles, we held that

the zoning ordinance in question did not regulate oil and gas drilling and, thus, was not preempted by the 1984 Oil and Gas Act.

The "how" versus "where" distinction was also addressed by the Pennsylvania Supreme Court in *Range Resources—Appalachia, LLC v. Salem Township,* 600 Pa. 231, 964 A.2d 869 (2009). The Court explained that under the 1984 Oil and Gas Act, traditional zoning regulation could prohibit drilling in certain districts. However, the municipality could not permit drilling in a certain district and then make that permission subject to operational regulations. In *Range Resources,* the township's zoning ordinance did just that. It conditioned drilling on getting township approval of site plans, storm water management plans, erosion and sediment control plans, grading of roads and bonding. The Supreme Court held that these regulations were directed at operations and, as such, were preempted by the 1984 Oil and Gas Act.

■ Here, the Planning Commission found that Geryville's quarry would violate several provisions of the Zoning Ordinance: Section 471.d (which limits the amount of woodlands that may be destroyed); Section 471.e (which mandates that a water course cannot be altered without design approval); Section 471.f (which mandates that wetlands cannot be altered without state and federal permits); Section 471.g (which limits the amount of wetlands that can be altered by a land development project); and Section 472.b (which requires a building envelope that meets the natural resource protection standards).[9] Geryville argues that its prelimi-

---

tional, null and void in *Robinson Township v. Commonwealth,* 52 A.3d 463 (Pa.Cmwlth. 2012)).

9. Section 471 of the Zoning Ordinance provides, in relevant part, as follows:

　471　*Natural Resource Protection Standards*
　All uses and activities established after the effective date of this Ordinance shall

nary plan did not call for destruction of any existing trees, a change to a watercourse or destruction of any amount of wetlands. The testimony used by the Planning Commission to find these violations of the Zoning Ordinance provisions related to the quarry's operation, or misoperation, not its placement. The violations will not occur unless the quarry's water control systems fail in some way. Crediting the Township experts proved, at best, that these violations would not take place for at least 50 or 60 years. The experts themselves acknowledged that the Department of Environmental Protection regulated both the quarry's operations with respect to the outflow of water and its infiltration system.

Britton, a licensed geologist, opined that Geryville's groundwater study did not confirm that the quarry's dewatering system would work. As a result, he predicted that the infiltration system would discharge water onto the ground and cause erosion that, in turn, would damage wetlands. Britton challenged Geryville's computer models that were done to simulate water outflow from the quarry. His own model showed that when mining reached a certain level,

comply with the following standards. Site alterations, regrading, filling or clearing of any natural resources prior to the submission of applications for zoning or building permits or the submission of plans for subdivision or land development shall be a violation of this Ordinance. In the event that two or more resources overlap, the resource with the greatest protection standard (i.e. permitting the least amount of alteration, regrading, clearing or building) shall apply to the areas of overlap.

\* \* \*

d. Woodlands: The following standards shall apply to woodlands:
(1) Woodlands in Environmentally Sensitive Areas. No more than twenty percent (20%) of woodlands located in environmentally sensitive areas shall be altered, regraded, cleared, or built upon. Environmentally sensitive areas shall include flood plains, flood plain soils, steep slopes, wetlands, wetland margins, and lake or pond shorelines.
(2) Other Woodland Areas. No more than fifty percent (50%) of woodlands which are not located in environmentally sensitive areas (specified in (1) above) shall be altered, regraded, cleared or built upon.
(3) [Providing for replacement of trees in certain situations].
e. Watercourses: Such areas shall not be altered, regraded, filled, piped, diverted, or built upon except where design approval is obtained from the Township and, if required, the Pennsylvania Department of Environmental Resources.

f. Wetlands: Such areas shall not be altered, regraded, filled, piped, diverted, or built upon except where state and federal permits have been obtained.

\* \* \*

g. Wetlands Margin: No more than twenty (20) percent of such areas shall be altered, regraded, filled or built upon. In addition, any Department of Environmental Protection regulations under Chapter 105 of Title 25 of the Pennsylvania Code concerning activities in wetlands margins shall be met. For the purposes of this Ordinance, the wetlands margin shall extend twenty-five (25) feet from the wetland boundary.

ZONING ORDINANCE, § 471.d(1)-(3), e, f, and g; R.R. 58a–60a. Section 472.b of the Zoning Ordinance provides as follows:

Building Envelope. The purpose of the identification of a building envelope as defined in these regulations is to provide sufficient area for the general location of the building, driveway, patio, other improvements and site alterations while meeting the natural resources protection standards and minimum setback requirements of this Ordinance.

Within any proposed subdivision, each lot shall have a contiguous building envelope of at least 8,000 square feet for residential lots and 20,000 square feet for other permitted uses. In the case of an existing lot, it must be demonstrated that the permissible building envelope will encompass the improvements and site alterations imposed. ZONING ORDINANCE, § 472.b; R.R. 61a.

water would flow out of the quarry onto West Mill Hill Road where it would pool and turn icy in the winter. Britton's model also showed that at 510 feet below sea level, the quarry's water outflow would adversely affect a stream. At 460 feet below sea level, the outflow would alter the wetlands. Britton acknowledged that it would take 50 to 60 years to reach the 460–foot level. Britton also acknowledged that the Department evaluates a quarry at each 50–foot mining interval and will not allow a permittee to move to the next 50–foot level without additional authorization.

Gallagher, an ecologist who does environmental consulting, testified that Geryville's development would alter the wetlands and watercourses. The drawdown of the water table in the vicinity of the quarry would change local hydrology and cause nutrients to migrate into the wetlands. When asked at what depth these problems would occur, Gallagher responded that it would be at 460 feet below sea level. He did not know how long it would take Geryville to reach this level. Gallagher agreed that the Department had issued Geryville a no-discharge permit, which meant that it was obligated to put the water back in the ground. He also conceded that the Department will continue to monitor the quarry. Any water discharge, mounding or erosion would place Geryville in violation of its permit. Gallagher also acknowledged that as long as the quarry is operational, the Department will monitor wetlands, the groundwater, the surface water and the streams that might be in the zone of risk. Should a problem arise, the Department has the power to force it to be corrected.

Geryville contends that this testimony offered by the Township relates to the quarry's operations, which are regulated by the Department, and not to the quarry's placement. Indeed, the Township's experts conceded that the Department regulates quarrying to prevent degradation to wetlands, groundwater, surface water and streams. Under Section 7(b) of the Mining Act, Geryville must provide the Department with a map of the proposed land, the drainage area and the location of all streams. 52 P.S. § 3307(b). Section 7(c) of the Mining Act requires Geryville to submit a detailed reclamation plan that includes a plan for restoring the area to its approximate original contour; a description of the manner in which the operation will segregate and conserve topsoil; a timetable for accomplishing each step of the reclamation plan and "[t]he manner in which the operator plans to control surface water drainage, including a practicable method of preventing or avoiding surface and groundwater pollution." 52 P.S. § 3307(c)(2)-(8).

Numerous regulations also require Geryville to protect the hydrologic balance. *See* 25 Pa.Code §§ 77.521–77.535 (setting effluent standards; the design of sediment control measures; the control of water discharge; and the monitoring of surface water). Other regulations require geology analysis, groundwater description, surface water information, alternative water supply information, vegetation information and land use information. *See* 25 Pa.Code §§ 77.404–77.409. Finally, the quarry must adopt sediment control measures and "demonstrate" how these measures will provide safe waterway management. 25 Pa.Code §§ 77.458–77.459.

Although the natural resource provisions of the Zoning Ordinance are neutral on their face, the Planning Commission turned them into operational regulations of Geryville's water issues that confront every quarry. Geryville points out, correctly, that one way to know if a regulation is truly a zoning ordinance is whether the violation will take place before the op-

eration begins or sometime later. *Arbor Resources,* 973 A.2d at 1046. Here, the violations of Geryville's permit that were predicted by the Township's experts will not take place for 50 years. In short, we agree that the provisions of the Zoning Ordinance, as they have been construed and applied to Geryville's preliminary plan, are preempted by the Mining Act.[10]

■ In its third issue, Geryville argues that the Planning Commission erred in holding that its property consisted of three separate parcels because two public roads cross it. The Planning Commission concluded that Section 472.d(1)(c) of the Zoning Ordinance requires an applicant to subtract land that is not contiguous to the main parcel when calculating the parcel's site capacity. It held that land separated by *any* road is not contiguous.

The Zoning Ordinance addresses site capacity as follows:

> d. Site Capacity Calculation. Each site is unique; it has physical features which are rarely duplicated precisely on another site. Portions of some sites may not be usable. The purpose of this subsection is to determine the appropriate intensity of use to which a specific tract may be put. For each tract, the following calculation shall be submitted by the developer.
>
> > (1) Base Site Area: Certain portions of tracts may not be usable for the activities proposed for the site; these shall therefore be subtracted from the site area to determine Base Site Area.
> >
> > * * *
> >
> > (c) Subtract—land which is not contiguous, i.e., a separate parcel which does not abut or adjoin, nor share common boundaries with the rest of

the development; and/or *land which is cut off from the main parcel by a road, railroad, existing land uses, and/or major stream so as to serve as a major barrier to common use,* or so that it is isolated and unavailable for building purposes.

ZONING ORDINANCE, § 472.d(1)(c); R.R. 61a–62a (emphasis added). The Planning Commission held that this provision required Geryville to subtract land that was "cut off from the main parcel by a road." *Id.* It reasoned that this construction was consistent with the Zoning Ordinance's definition of a "lot" as "[a] parcel of land held in one ownership not divided by a street." ZONING ORDINANCE, § 960; R.R. 65a. Therefore, Geryville was required to calculate the site capacity of its land as if it were three separate lots.

■ Geryville responds that its preliminary plan concerned one contiguous 84.56–acre parcel of land, notwithstanding the roads that traverse it. A public street is an easement for the right of the public to pass over the surface without effect upon the ownership of the land over which the street passes. *Versailles Township Authority of Allegheny County v. City of McKeesport,* 171 Pa.Super. 377, 90 A.2d 581 (1952). The easements do not change the boundary lines of the properties they cross; the property boundaries meet in the middle of the road. Geryville further observes that Section 472.d(1)(c) of the Zoning Ordinance applies only to land that is separated from the main parcel where the road in question serves "as a major barrier to common use" of the entire parcel, and that is not the case here. The quarry pit is located on one side of the road and the infiltration trenches, which handle the

---

10. Given this determination, we need not address Geryville's second argument, *i.e.,* that the Township's evidence was incompetent because it was all based on the premise that its water control systems, designed to the Department's specifications, would not work.

groundwater pumped from the quarry, will be located on the other side; West Mill Hill Road is easily crossed.

Section 472.d(1)(c) of the Zoning Ordinance does not state that any road automatically creates two separate parcels. Only roads that "serve as a major barrier to common use" have that effect. The trial court did not address this point. No evidence was presented that West Mill Hill Road is a "major barrier" to Geryville's proposed common use of its property for the quarry and the supporting infiltration trenches.

The Planning Commission also relied on the Zoning Ordinance's definition of "lot," but only on its first sentence. In its entirety, Section 960 states:

> A parcel of land held in one ownership not divided by a street. A lot, for the purpose of this Ordinance, *shall also mean the total plot in single ownership whether or not it is made up of one or more contiguous parcels and whether or not such contiguous parcels were acquired at the same time or at different times.* Upon the acquisition of contiguous parcels, they, together with the original parcel, shall be considered as a single lot.

ZONING ORDINANCE, § 960; R.R. 65a (emphasis added). Geryville argues that "shall also mean" is an alternative definition of a "lot" that includes its entire parcel because its "total plot [is] in single ownership whether or not it is made up of one or more contiguous parcels." *Id.* Alternatively, Geryville argues that there is an ambiguity in the definition of lot and, as

such, Section 960 must be construed against the Township.[11] We agree.

First, Section 960 of the Zoning Ordinance is irrelevant because the Township's Subdivision and Land Development Ordinance directs that site capacity calculations be done in accordance with Section 472.d of the Zoning Ordinance and does not mention Section 960. *See* LOWER MILFORD TOWNSHIP SUBDIVISION AND LAND DEVELOPMENT ORDINANCE, § 314.22 (1997) (SALDO).[12] Section 472.d(1)(c) provides that non-contiguous land is

> a separate parcel which does not abut or adjoin, nor share common boundaries with the rest of the development; and/or *land which is cut off from the main parcel by a road, railroad, existing land uses, and/or major stream so as to serve as a major barrier* to common use, or so that it is isolated and unavailable for building purposes.

ZONING ORDINANCE § 472.d(1)(c); R.R. 62a (emphasis added). Not every road creates two separate parcels. Only a road that creates a "major barrier to common use" has this effect. That is not the case here. The quarry will be on one side of the road and the water infiltration system on the other. This would not be possible if the road were a "major barrier."

At best, the Commission has established that there is an ambiguity in the definition of a lot. Where there is an ambiguity, Section 603.1 of the MPC provides as follows:

> In interpreting the language of zoning ordinances to determine the extent of the restriction upon the use of the property, the language shall be interpreted,

---

11. The Planning Commission points to a 1993 letter of the Township solicitor advising the Township that a parcel of land with a public road across it is simply irrelevant. We agree.

12. It states:

Site Capacity Calculation per Section 472.d of the Zoning Ordinance. All measurements used for these calculations shall be indicated for each resource on the natural features map.

SALDO, § 314.22; R.R. 67a.

where doubt exists as to the intended meaning of the language written and enacted by the governing body, in favor of the property owner and against any implied extension of the restriction.

53 P.S. § 10603.1.[13]

We hold that the trial court erred. Section 472.d(1)(c) of the Zoning Ordinance did not make Geryville's 84.56–acre parcel into three separate parcels.

■ In its fourth issue, Geryville contends that there is no foundation to the Planning Commission's holding that it submitted a "partial" preliminary plan. This issue was not addressed by the trial court. At issue is the Township's SALDO, which states, in relevant part, as follows:

No partial subdivisions or land developments are permitted. The Preliminary Plan for the tract to be subdivided or developed must be submitted in total.

SALDO, § 318; R.R. 68a.

At the September 28, 2011, proceeding, the Planning Commission's solicitor asked Geryville if it had requested a special exception from the Zoning Hearing Board to quarry on the entire 628–acre parcel. Counsel for Geryville replied that it sought a special exception for 84.56 acres. He explained that Geryville only planned to mine one quarry hole. If it wanted to do something more in the future, it would submit another land development plan.

At the October 3, 2011, proceeding, the Township solicitor submitted Geryville's zoning application into evidence, noting that it described its property as consisting of 628 acres. Counsel for Geryville stated that he repeatedly told the Zoning Hearing Board that the "only thing we're asking for is to mine the [84.56] acres. There was no question at the zoning hearing board proceeding that we might be trying

to do the whole property." R.R. 393a; N.T. 74. He explained that the zoning application asks for the lot size. "It asks for what you own, and we put it in there." R.R. 393a; N.T. 76. Geryville owns 628 acres. When Geryville submitted its preliminary plan to the Planning Commission, it identified future phases marked as "stone reserve[s]" outside of the 84.56–acre area. R.R. 393a; N.T. 74. When there was an objection to that, Geryville agreed that the areas marked future phasing would be considered omitted and the land development plan would only address the 84.56 acres that were to be mined. Geryville argues that its special exception application to the Zoning Hearing Board is irrelevant.

The Planning Commission argues that Geryville was required to provide the same level of detail for all future phases. Having not done so, development "in the future would constitute an impermissible partial land development." Commission Brief at 36. Geryville notes that neither the Township nor the Planning Commission assert that the preliminary plan that is the subject of this appeal is a partial plan. Rather, they argue that any plan Geryville might submit "in the future" would constitute an impermissible partial plan.

We agree with Geryville that it has not been established that it submitted an impermissible partial land development plan. At best, it has been shown that Geryville hopes to do something productive with the remaining 500+ acres of land that it owns in the Township. For now, Geryville has a specific development plan for 84.56 acres, and all activity will take place on those 84.56 acres. Further, throughout the proceedings in this matter, Geryville consistently maintained that it plans only

---

**13.** Section 603.1 was added by the Act of December 21, 1988, P.L. 1329.

a development of the 84.56 acres. The Township cites no authority for the view that a landowner's hope to develop other land in the future requires the present submission of a detailed land development plan when no such plan exists.

For these reasons, we reverse the order of the trial court and remand the matter to the trial court with the instruction that it be remanded to the Planning Commission for approval of the preliminary plan, subject to the conditions the Planning Commission set forth in the decision of October 14, 2011.[14]

Judge COHN JUBELIRER concurs in the result only.

### ORDER

AND NOW, this 30th day of July, 2013, the order of the Court of Common Pleas of Lehigh County (trial court) is hereby REVERSED, and this matter is REMANDED to the trial court with the instruction that this matter be remanded to the Planning Commission of Lower Milford Township for approval of the preliminary plan, subject to conditions, in accordance with the attached opinion.

Jurisdiction relinquished.

---

14. Because we find in Geryville's favor, we need not address its final allegation of error, *i.e.*, that the Planning Commission did not act in good faith.