IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Spear Products, Inc., Spear Holdings,   :
LLC, Kyle Fliszar, Harold and Ellen   :
Yerkes, Gerald and Mary Anne Claire,   :
and Clean Air Council,   :
               Appellants   :
  :
          v.   :
  :
Springfield Township, H&K Group,   :
Inc., and Springfield Township Board   :   No. 1627 C.D. 2024
of Supervisors   :   Argued: October 7, 2025

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE ANNE E. COVEY, Judge
            HONORABLE MATTHEW S. WOLF, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                         FILED: November 19, 2025

        Spear Products, Inc. (Spear Products), Spear Holdings, LLC (Spear Holdings), Kyle Fliszar (Fliszar), Harold and Ellen Yerkes (the Yerkes), Gerald and Mary Anne Claire (the Claires), and the Clean Air Council[1] (collectively, Objectors) appeals from the Bucks County Common Pleas Court's (trial court) November 6, 2024 order affirming the Springfield Township (Township)[2] Board of Supervisors' (Board) decision that approved H&K Group, Inc.'s (Applicant) application for a conditional use (Application) and dismissing Objectors' appeal (Decision). Objectors present five issues for this Court's review: whether the trial court erred or abused its discretion by: (1) finding that Applicant met its burden of proving

---

[1] The Clean Air Council is a tax-exempt non-profit organization started in 1967 in Pennsylvania, with a mission to protect citizen rights to clean air and a healthy environment. It has members throughout Bucks County, including Fliszar, who lives on the perimeter of the proposed quarry site.

[2] The Township is a Second Class Township.

compliance with the specific, objective criteria of the Springfield Township Zoning Ordinance (Ordinance);[3] (2) upholding the Board's determination that the Noncoal Surface Mining Conservation and Reclamation Act[4] (Mining Act) preempts numerous Ordinance provisions; (3) affirming the Board's grant of conditional use approval, which relies upon preemption of numerous provisions of the Ordinance while, at the same time, imposing conditions directly implicating the subject matter of the Ordinance provisions claimed to have been preempted; (4) overlooking the Board's arbitrary and capricious disregard of competent evidence that the proposed use poses a threat to the health, safety, and general welfare of the community in a way not normally expected from that type of use; and (5) affirming the Board's grant of conditional use approval in a manner inconsistent with its duties as trustee under the Environmental Rights Amendment of the Pennsylvania Constitution (ERA), PA. CONST. art. I, § 27. After review, this Court affirms.

## Background

On or about March 13, 2020, Applicant filed the Application with the Board seeking approval to construct the Center Valley Materials Quarry on property located at 2320 Township Road, Quakertown, in the Township's Planned Industrial (PI) Zoning District (Property), where a quarry is permitted as a conditional use.[5] The Property consists of 194.204 acres and, except for a 7.6 acre stoned area currently used to park tractor trailers and two overhead utility rights-of-way, the site

---

[3] Springfield Twp., Pa., Code of Ordinances (2007), http:// codelibrary.amlegal.com/codes/springfieldpa/latest/springfieldt_pa/0-0-0-4755#JD_Ch.154AppendixA (last visited Nov. 18, 2025).

[4] Act of December 19, 1984, P.L. 1093, *as amended*, 52 P.S. §§ 3301-3326.

[5] The Property consists of Tax Map Parcel Nos. 42-004-075, 42-004-076, 42-004-106, and 42-004-107. At that time, Liberty Home Development Corporation, Ltd. (Liberty Home) owned the Property and leased it to Applicant to conduct noncoal surface mining. On November 14, 2022, Liberty Home transferred ownership of the Property to Applicant.

2

consists predominantly of wooded land.[6] The Property has some wetlands/regulated waters, including an unnamed tributary of the Tohickon Creek that traverses the central portion of the Property. Applicant proposed to mine 19.43 acres in the Property's South Extraction Area of the Property for approximately 16 to 20 years,[7] then cease active mining operations there and commence mining 20.84 acres in the Property's North Extraction Area, subject to permitting from the Pennsylvania Department of Environmental Protection (DEP).[8] Applicant owns and operates Coopersburg Materials, an asphalt batching plant across the street from the entrance to the proposed quarry.

After reviewing the Application, Township engineer Timothy Fulmer, P.E. (Fulmer), informed the Township's Planning Commission (Planning Commission) by June 9, 2020 letter listing issues to be resolved when considering the Application. Fulmer recommended that the Planning Commission deny the Application unless those issues are resolved to the Township's satisfaction. *See* Reproduced Record (R.R.) at 1633a-1637a. By letter dated June 29, 2020, Applicant responded to Fulmer's concerns, resubmitted its Overall Site Plan (prepared March 13, 2020; revised June 29, 2020), *see* Ex. A-2, and included a June 2020 Transportation Impact Study for the Proposed Center Valley Materials Quarry (TIS).

---

[6] The Property is bounded to the north by industrial uses along Springfield Street, to the east by residential uses along Salem Road, to the south by residential uses along Mine Road, and to the west by the Upper Bucks Rail Trail (under construction) and commercial and industrial uses along Route 309.

[7] Applicant stated that, based on the size of the proposed operation, the quarry would probably produce approximately 500,000 tons of material per year. *See* Original Record (O.R.), 10/13/2020 Notes of Testimony (N.T.), at 85; *see also* O.R., 11/10/2020 N.T. at 82; O.R., 2/9/2021 N.T. at 32-33; O.R., 3/9/2021 N.T. at 77-86. Also, as a condition for approval, Applicant agreed to "limit its overall outside sales of materials obtained from the site to 500,000 tons per year. Should the Applicant need to exceed this limit, Applicant shall obtain approval from the Township." Condition No. 33 (Reproduced Record at 33a).

[8] Applicant will undertake reclamation of the extraction areas upon completion of its mining activities in such a way as to support a post-mining land use of unmanaged natural habitat with a water-filled impoundment or a future land use permitted in the PI Zoning District.

*See* R.R. at 769a-1102a; *see also* Exs. A-1 (6/29/2020 Letter), A-2 (Revised Overall Site Plan), A-3 (TIS). By July 10, 2020 letter, the Planning Commission expressed concerns to the Board and listed requirements Applicant should satisfy for the Board to grant the Application and suggested conditions the Board should impose, if Applicant satisfied those requirements. *See id*. at 1646a-1650a.

From September 8, 2020[9] to February 14, 2023, the Board conducted a series of 31 hearings (some virtually via Zoom) regarding the Application, at which the Board granted Objectors party status. At the conclusion of the hearings, on April 11, 2023, the Board unanimously voted to approve the Application subject to 34 conditions intended to mitigate the impacts of the proposed use. On May 15, 2023, the Board issued the Decision approving the Application conditioned, in part, on Applicant beginning operations in the North Extraction Area.[10] *See* R.R. at 4a-41a. On June 14, 2023, Objectors appealed to the trial court. On July 5, 2023, Applicant filed a Notice of Intervention. On August 16, 2023, the Township filed a Notice of Non-Participation.

On September 5, 2023, the trial court remanded the matter to the Board to provide further detailed explanations for its approval. *See* R.R. at 105a-107a. On November 3, 2023, the Board issued a Supplemental Conditional Use Decision addressing the trial court's issues on remand (Supplemental Decision). *See* R.R. at 108a-154a. On December 1, 2023, Objectors filed an amended appeal in the trial court. At the trial court's direction, the parties filed their respective briefs. On

---

[9] On or about June 24, 2020, Applicant waived the requirement in the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202, and the Act of April 20, 2020, P.L. 82 (Act 15 of 2020) (COVID-19 Disaster Emergency), that the first hearing had to be held within 60 days of May 20, 2020.

[10] Applicant did not challenge any of the Board's conditions. In fact, during the hearings, Applicant agreed to the Planning Commission's proposed conditions. *See* O.R., 10/8/2020 N.T. at 104-110.

November 6, 2024, the trial court affirmed the Board's Supplemental Decision and dismissed Objectors' appeal. *See* R.R. at 498a-575a.

On December 4, 2024, Objectors appealed to this Court.[11] On December 6, 2024, the trial court directed Objectors to file a Concise Statement of Errors Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure (Rule) 1925(b) (Rule 1925(b) Statement). On December 24, 2024, Objectors filed their Rule 1925(b) Statement. The trial court issued its opinion pursuant to Rule 1925(a) (Rule 1925(a) Opinion) on February 3, 2025. *See* R.R. at 579a-601a.

On March 18, 2025, the Township and the Board notified this Court that they would not participate in this appeal. On June 24, 2025, the Clean Air Council filed its brief. That same day, Spear Products, Spear Holdings, Fliszar, the Yerkes, and the Claires joined Clean Air Council's brief.

---

[11] "Where the trial court takes no additional evidence, [this Court's] review in a land development appeal is limited to determining whether the local governing body committed an error of law or an abuse of discretion." *Grim v. Maxatawny Twp. Bd. of Supervisors*, 297 A.3d 1, 5 n.7 (Pa. Cmwlth. 2023) (quoting *Berner v. Montour Twp.*, 120 A.3d 433, 436 n.5 (Pa. Cmwlth. 2015)).

> "An abuse of discretion occurs when [a local agency's factual] findings are not supported by substantial evidence in the record." *Coal Gas Recovery, L.P. v. Franklin T[wp.] Zoning Hearing B[d.]*, 944 A.2d 832, 838 (Pa. Cmwlth. 2008). "By 'substantial evidence' we mean such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Valley View Civic Ass['n] v. Zoning B[d.] of Adjustment*, . . . 462 A.2d 637, 640 ([Pa.] 1983) (citations omitted).

*Mahoning Twp. v. Zoning Hearing Bd.*, 320 A.3d 861, 868 n.2 (Pa. Cmwlth. 2024). "[This Court] appl[ies] this deferential standard of review because [it] do[es] not sit as 'a super [zoning hearing board]' and[,] thus[,] '[t]he necessity must be clear before there is justification for judicial interference with the municipality's exercise of its zoning power.'" *Plum Borough v. Zoning Hearing Bd. of Borough of Plum*, 310 A.3d 815, 823 (Pa. Cmwlth. 2024) (quoting *Robert Louis Corp. v. Bd. of Adjustment of Radnor Twp.*, 274 A.2d 551, 555 (Pa. Cmwlth. 1971)).

## Discussion

Initially,

[a] conditional use is defined as "[a] use permitted in a particular zoning district pursuant to the provisions in Article VI" of the [Pennsylvania Municipalities Planning Code (]MPC[)]. *See* Section 107(a) of the MPC, 53 P.S. § 10107(a). A governing body [(i.e., the board of supervisors)] has authority to grant a conditional use "pursuant to express standards and criteria set forth in the zoning ordinance." Section 603(c)(2) of the MPC, 53 P.S. § 10603(c)(2). A conditional use involves the use of the land, as opposed to the particular design details of the development. *Joseph v. N[.] Whitehall T[wp.] B[d.] of Supervisors*, 16 A.3d 1209, 1215 (Pa. Cmwlth. 2011). An applicant is entitled to a conditional use as a matter of right, unless it is determined "that the use does not satisfy the specific, objective criteria in the zoning ordinance for that conditional use." *In re Drumore Crossings, L.P.*, 984 A.2d 589, 595 (Pa. Cmwlth. 2009).

The applicant bears the burden of establishing that the proposed conditional use satisfies the specific criteria in the zoning ordinance. *Id.* The board [of supervisors] is the fact[-]finder, with the responsibility for credibility determinations and the weight to be assigned the evidence. *Joseph*, 16 A.3d at 1218. If the board [of supervisors] is persuaded that the application complies with the zoning ordinance, a presumption arises that "the proposed use is consistent with the general welfare of the community." *H.E. Rohrer, Inc. v. Zoning Hearing B[d.] of Jackson T[wp.]*, 808 A.2d 1014, 1018 (Pa. Cmwlth. 2002). A conditional use evidences a legislative determination that the use will not have an adverse impact on the public interest in normal circumstances. *In re Cutler Gr[p.], Inc.*, 880 A.2d 39, 42 (Pa. Cmwlth. 2005).

The burden then "shifts to [the] objectors to rebut the presumption by proving that there is a high degree of probability the proposed use will adversely affect the welfare of the community in a way not normally expected from the type of use." *H.E. Rohrer, Inc.*, 808 A.2d at 1018. "Mere speculation" of possible harm is not sufficient, and the objectors' burden may not be satisfied with personal

6

> opinion or bald assertions. *Id*. Pointedly, a "conditional use application *must* be granted unless the objectors present sufficient evidence that the proposed use has a detrimental effect on the public health, safety and welfare." *In re McGlynn*, 974 A.2d 525, 537 (Pa. Cmwlth. 2009) (emphasis added).

*Brookview Solar I, LLC v. Mount Joy Twp. Bd. of Supervisors*, 305 A.3d 1222, 1233 (Pa. Cmwlth. 2023).

Here, the Board concluded based on the evidence presented at the hearings that, so long as Applicant complies with the conditions imposed upon its approval, Applicant's proposed use: is appropriate for the Property and will not destroy the character of the surrounding residential neighborhoods (*see* Conclusion of Law (COL) 9); provides for adequate access to public roads, without creating hazardous conditions at intersections and without creating undue congestion, and access to the site is safe (*see* COL 10); is compatible with the surrounding uses (*see* COL 11); will not result in safety risks from fire, panic, and other dangers (*see* COL 12); will not result in overcrowding of land or congestion of population (*see* COL 13); will facilitate the adequacy of public and community services (*see* COL 14); and will be suitable for the site with respect to the conservation of natural resources (*see* COL 15).[12] *See* R.R. at 21a-22a. The Board also concluded that Applicant satisfactorily proved the proposed use's compliance with criteria not preempted by the Mining Act (i.e., *where* mining may take place), and that the proposed use does not violate the ERA.[13] *See* R.R. at 22a-28a.

---

[12] The Board acknowledged that, although Applicant did not submit a specific environmental impact assessment, it provided reports and testimony concerning the topics listed in Section 404(G)(7)(d)12 of the Ordinance, including groundwater and surface water, air quality, noise and odor, vehicle traffic, and soil quality, which established that the proposed quarry use will not harm the health or environment as long as Applicant complies with the Board's conditions.

[13] Although not specifically challenged in this appeal, the Board also concluded that the Upper Bucks Rail Trail is not a *park* Applicant was required to depict on its Application. *See* R.R. at 30a.

In addition, the Board declared that Objectors failed to present sufficient evidence to prove to a high degree of probability that the proposed quarry use will have a significantly greater effect on any residential areas than any other noncoal surface mining operation of a similar size and nature located on the Property, that the proposed use will have a detrimental effect on the public health, safety, and welfare of the community, and that Objectors offered only speculation and conjecture concerning potential impacts associated with the proposed quarry's operation. *See* R.R. at 22a. The trial court agreed. *See* Trial Ct. Op. at 59-64 (R.R. at 556a-561a).

## 1. Conditional Use Criteria

At the outset, Section 609.A(2)(p) of the Ordinance permits a quarry as a conditional use in the Township's PI Zoning District if all of the Ordinance's specific, objective requirements are met. *See* Ord. § 609.A(2)(p). Section 802 of the Ordinance sets forth the general criteria for the Board's approval of a conditional use.[14] Section 802.4.C of the Ordinance requires the Board to deny an application unless it makes a favorable finding that "[t]he application has provided credible evidence that the proposal conforms to all applicable requirements of this Ordinance." Ord. § 802.4.C.

Section 402.1 of the Ordinance specifies: "All uses permitted by . . . conditional approval shall be subject, in addition to use regulations, to such regulations of yard, lot size, lot width, building area and height, impervious surfaces, easements, buffer yards, off-street parking, and such other provisions as are specified in other Articles herein." Ord. § 402.1. Section 404.G(7) of the Ordinance mandates the following for quarry uses:

---

[14] *See* https://codelibrary.amlegal.com/codes/springfieldpa/latest/springfieldt_pa/0-0-0-7918 (last visited Nov. 18, 2025).

*Quarry*.  Shall include extraction of materials from the ground, such as sand, clay, shale, gravel, top[]soil, stone[,] and similar materials.

   (a)  *General Requirements*.

      1)  All applications for zoning permits or annual renewal permits for quarries shall be made in writing by the owner, tenant, vendee under contract of sale on a form supplied by the Township, which shall be filed with the Zoning Officer.  The applications shall be accompanied by plans and other materials to show compliance with the following provisions and regulations:

         a)  There shall be a berm of minimum height of 15 feet and maximum height of 50 feet surrounding the entire property site.  Berms will be required along existing quarry faces to the extent which the Board . . . determines is feasible.  The slope of the sides of the berm shall not exceed a 3:1 ratio.  Berms shall be planted and dusted, and erosion control measures shall be taken as may be approved by the [Bucks] County Conservation District. Berms shall begin at a point no closer to a street than the ultimate right-of-way line.  No berms shall be constructed closer than 15 feet to a district in which extraction operations are not permitted.  Planting of the berms and yard areas shall be sufficient to screen the quarry extraction operations.  Both planting and berm construction shall be according to a plan approved by the Board . . . which shall include a reasonable timetable for completion.  Such planting shall consist of evergreens of such species and size as will produce, within [three] years, a complete all season visual screen of at least [eight] feet in height.

. . . .

      2) Any application for a zoning permit or an annual renewal permit as hereinafter provided shall be accompanied by plans and other information to satisfy the criteria set forth in clause (a) above and in addition shall depict:

         a)  Plan of general area within a 1/2 mile radius of the site at scale of 500 feet or less to the inch with a 50-foot or less contour interval to show:

9

. . . .

xiii. Plan of operation showing - proposed tree screen locations. Soil embankments for noise, dust[,] and visual barriers and heights of soil mounds method of and provision for disposition of excess water during operation location and typical schedule of blasting machinery - type and noise. Safety measures - monitoring of complaints.

. . . .

12) *Environmental Impacts*. An environmental impact assessment shall be submitted to the Township that details potential impacts to human health and the environment from all aspects of the use, including, but not limited to:

a) Ground water and surface water.

b) Air quality (particulate and toxic substances).

c) Noise and odor beyond the property line.

d) Vehicle traffic, particularly to consider the ability of the road system to handle the truck traffic.

e) Soil quality.

. . . .

14) A traffic impact study shall be submitted at the time of the conditional use application. Such study shall meet the requirements of the Subdivision and Land Development Ordinance and shall analyze the ability of the road base and widths of existing public streets to handle the resulting traffic.

15) If blasting will be used, a pre-blast survey shall be conducted of existing conditions of buildings and streets in the vicinity. A copy of such survey shall be submitted to the Township.

Ord. § 404.[15]  In addition, Section 509 of the Ordinance sets forth Environmental Protection Standards, which contain broad provisions protecting, *inter alia*, wetlands, streams, floodplains, woodlands, seeps, springs, and steep slopes.  *See* Ord. § 509.[16]

Preemption

Notwithstanding, "municipalities are creatures of the statute and have no inherent powers of their own.  Rather, they possess only such powers of government as are expressly granted to them and as are necessary to carry the same into effect."  *McNew v. E. Marlborough Twp.*, 295 A.3d 1, 12 (Pa. Cmwlth. 2023) (quoting *UGI Utils., Inc. v. City of Lancaster*, 125 A.3d 858, 863 (Pa. Cmwlth. 2015)).  In Section 601 of the MPC, the General Assembly authorized "[t]he governing body of each municipality, in accordance with the conditions and procedures set forth in th[e MPC], [to] enact, amend and repeal zoning ordinances to implement comprehensive plans and to accomplish any of the purposes of th[e MPC]."  53 P.S. § 10601.  In particular, Section 603(i) of the MPC provides that "ordinances shall provide for the reasonable development of minerals in each municipality."  53 P.S. § 10603(i).  However, "even in areas over which municipalities have been granted power to act, the state may bar local governing bodies from legislating in a particular field."  *Hoffman Mining Co., Inc. v. Zoning Hearing Bd. of Adams Twp., Cambria Cnty.*, 32 A.3d 587, 593 (Pa. 2011).

Relevant here, the General Assembly enacted the Mining Act on December 19, 1984 (effective on February 17, 1985), "to address the negative [e]ffects of surface mining by improving conservation of the land, protecting the

---

[15]  *See*  https://codelibrary.amlegal.com/codes/springfieldpa/latest/springfieldt_pa/0-0-0-5322#JD_Ch.154&#167;404 (last visited Nov. 18, 2025).

[16]  *See*  https://codelibrary.amlegal.com/codes/springfieldpa/latest/springfieldt_pa/0-0-0-6683 (last visited Nov. 18, 2025).

health and safety of citizens and wildlife, and limiting pollution." *Pennsy Supply, Inc. v. Zoning Hearing Bd. of Dorrance Twp.*, 987 A.2d 1243, 1253 (Pa. Cmwlth. 2009) (quoting *Tinicum Twp. v. Del. Valley Concrete, Inc.*, 812 A.2d 758, 760 n.4 (Pa. Cmwlth. 2002)). Section 16 of the Mining Act declares: "Except with respect to ordinances adopted pursuant to the [MPC,[17]] all local ordinances and enactments purporting to regulate surface mining are hereby superseded. **The Commonwealth**, by this enactment, hereby **preempts the regulation of surface mining** as herein defined." 52 P.S. § 3316 (emphasis added). The Mining Act authorizes DEP to regulate the operation of noncoal surface mining.[18]

This Court has ruled that regardless of the MPC's enabling authority for municipalities to implement ordinances to carry out their comprehensive plans, the second sentence of Section 16 of the Mining Act preempts all local ordinances enacted to regulate noncoal surface mining after February 17, 1985. *See Gibraltar Rock, Inc. v. New Hanover Twp.*, 118 A.3d 461 (Pa. Cmwlth. 2015) (*Gibraltar Rock II*); *see also* Section 603(b) of the MPC, 53 P.S. § 10603(b) (local ordinances may regulate mineral extraction except to the extent the Mining Act preempts such regulation). Because the Ordinance in the instant matter was enacted in 2007, *after* the Mining Act's effective date, the Mining Act preempts the Ordinance's provisions that regulate noncoal surface mining operations.

> In defining the relationship between the [Mining] Act's preemption provision and land use regulation, this Court has recognized a distinction between an ordinance or

---

[17] "Where a township has enacted an ordinance pursuant to the MPC prior to the effective date of the . . . Mining Act, the . . . Mining Act does not supersede or preempt the ordinance." *Pennsy Supply, Inc.*, 987 A.2d at 1254.

[18] Section 5(a) of the Mining Act declares, in relevant part: "No person shall conduct a surface mining operation unless the person has first applied for and obtained a license from [DEP]." 52 P.S. § 3305(a); *see also* Section 77.51(a) of DEP's Regulations, 25 Pa. Code § 77.51(a). Chapter 77 of DEP's Regulations outlines DEP's authority over noncoal mining. *See* 25 Pa. Code §§ 77.1-77.808.

zoning provision governing *where* a facility may be located (which is not preempted) and, on the other hand, **an ordinance** or operational regulation **dictating *how* the facility will be technically designed and operated** (which **is preempted**). *Geryville Materials, Inc. v. Planning Comm'n of Lower Milford Twp., Lehigh Cnty.*, 74 A.3d 322, 324 (Pa. Cmwlth. 2013). Regardless of whether an ordinance applies specifically to a quarry or is neutral on its face, the ordinance will be preempted as an operational regulation if it regulates "surface mining" as that term is statutorily defined. *Id*. at 329-30.

*Gibraltar Rock II*, 118 A.3d at 466 (bold emphasis added); *see also Frederick v. Allegheny Twp. Zoning Hearing Bd.*, 196 A.3d 677 (Pa. Cmwlth. 2018); *Geryville Materials, Inc.*, 74 A.3d at 326 ("When an ordinance regulates the operations of a surface mine, it goes beyond the purview of traditional land use controls."); *E. Rockhill Twp. v. Richard E. Pierson Materials Corp.*, 364 F.Supp.3d 436 (E.D. Pa. 2019). Another way to make the distinction between traditional land use controls and operational limitations is that "zoning ordinances 'that become pertinent only after land use approval is granted' [a]re likely to be ordinances that regulate operations, not land use." *Geryville Materials, Inc.*, 74 A.3d at 327 (quoting *Arbor Res., LLC v. Nockamixon Twp.*, 973 A.3d 1036, 1046 (Pa. Cmwlth. 2009)).

Subject to exceptions not applicable here, Section 3 of the Mining Act broadly defines *surface mining* as:

> **The extraction of minerals** from the earth, from waste or stockpiles or from pits or from banks by removing the strata or material that overlies or is above or between them or otherwise exposing and retrieving them from the surface, **including**, **but not limited to**, strip mining, auger mining, dredging, **quarrying** and leaching **and all surface activity connected with surface** . . . **mining**, **including**, but not limited to, exploration, **site preparation**, entry, tunnel, drift, slope, shaft and borehole drilling[,] **and construction and activities related thereto**[.]

13

52 P.S. § 3303 (emphasis added). "Notably missing from the [] Mining Act's definition . . . is any mention whatsoever of either the location of surface mining or traditional land use regulation." *Hoffman Min. Co., Inc.*, 32 A.3d at 600. Because the Mining Act does not govern the *location* of surface mining within a municipality, nor prohibits traditional local land use ordinances affecting *where* such operations are located, such regulation is left up to each municipality.[19]

Relevant here, Pennsylvania courts have ruled that although the Mining Act does not preempt local setback provisions or a local government's authority to allow quarrying operations by conditional use, it does preempt local ordinances governing "buffers and berms, overburden storage, reclamation, and drainage structures" because they regulate surface mining operations. *Warner Co. v. Zoning Hearing Board of Tredyffrin Twp.*, 612 A.2d 578, 582 (Pa. Cmwlth. 1992); *see also In re Gibraltar Rock, Inc.* (Pa. Cmwlth. No. 2287 C.D. 2011, filed Oct. 11, 2013) (*Gibraltar Rock I*)[20] (the Mining Act preempts a municipality's regulation of a berm's location or height, but not the timing of when a berm must be installed). The Mining Act also preempts blasting ordinances, *see* Original Record (O.R.), 11/10/2020 N.T. at 88; *see also Tinicum Twp.*, stormwater management ordinances, *see Gibraltar Rock II*, and ordinances regulating wetlands, groundwater, surface water, and streams at a quarry. *See Geryville Materials, Inc.*

Here, Objectors argue that the Board erred or abused its discretion by finding that Applicant met its burden of proving compliance with the objective criteria of the Ordinance. Objectors specifically contend that Applicant did not meet

---

[19] Applicant's manager and engineer Scott S. Drumbore, P.E. (Drumbore) explained that Applicant must obtain site approval from the Board before it can apply to DEP for a large noncoal surface mining permit. *See* O.R., 12/8/2020 N.T. at 74-76; *see also* O.R., 1/12/2021 N.T. at 22-24, 58.

[20] Unreported decisions of this Court issued after January 15, 2008, may be cited as persuasive authority pursuant to Section 414(a) of this Court's Internal Operating Procedures. 210 Pa. Code § 69.414(a). *Gibraltar Rock I* is cited for its persuasive value.

its burden of proving compliance with Section 404.G(7)(d)12) of the Ordinance and the ancillary natural resource protections in Section 509 of the Ordinance, in addition to the berm requirements in Section 404.G(7)(a)1)a) of the Ordinance, and the blasting requirements in Section 404.G(7)(a)2)a)xiii and (d)15) of the Ordinance.[21]

Section 404.G(7)(d)12) of the Ordinance

Section 404.G(7)(a)1) of the Ordinance requires that "[a]ll applications for zoning permits for quarries shall be made in writing . . . on the form supplied by the Township . . . accompanied by plans and other materials to show compliance with" the provisions that follow, *see* Ord. § 404.G(7)(a)1), among which is Section 404.G(7)(d)12) of the Ordinance, which specifies:

> An environmental impact assessment shall be submitted to the Township that details potential impacts to human health and the environment from all aspects of the use, including, but not limited to:
>
> a) Ground water and surface water.
>
> b) Air quality (particulate and toxic substances).
>
> c) Noise and odor beyond the property line.
>
> d) Vehicle traffic, particularly to consider the ability of the road system to handle the truck traffic.
>
> e) Soil quality.

Ord. § 404.G(7)(d)12). Section 509 of the Ordinance more broadly lists environmental protection and contains provisions protecting floodplains, lakes and ponds, wetlands and wetland riparian buffers, streams and watercourses, slopes, woodlands, carbonate geology, and productive agricultural soils. *See* Ord. § 509.

---

[21] Because Objectors limit the arguments in their appeal brief to this Court to those specific provisions, this Court's analysis is limited to those provisions.

15

Objectors claim that Applicant's failure to submit a single, comprehensive, written report that addressed all five of the criteria set forth in Section 404.G(7)(d)12) of the Ordinance was fatal to the Board's approval. Indeed, the Board determined that Applicant did not submit a single, written environmental assessment *report*, but declared that Applicant "provided reports and testimony concerning the topics listed in Section 404.G(7)(d)[]12) of the [] Ordinance, including groundwater and surface water, air quality, noise and odor, vehicle traffic[,[22]] and soil quality." COL 21 (R.R. at 22a); *see also* Suppl. Dec. (R.R. at 127a-128a).

Section 404.G(7)(d)12) of the Ordinance does not specify that the required environmental impact assessment must be a single, *written report*. Rather, that provision seeks an environmental impact *assessment*, a term neither the Ordinance nor the MPC defines. Merriam-Webster's online dictionary defines *assessment* as "the action or an instance of making a judgment about something : the act of assessing something : appraisal" (emphasis omitted).[23] Applicant clearly presented its assessments of each of the criteria in Section 404.G(7)(d)12) of the Ordinance in its Application together with applicable reports. *See* R.R. at 1528a-1529a. Because there was no express requirement for Applicant to submit a comprehensive, written environmental impact *report* to the Township with its Application, Applicant did not violate Sections 404.G(7)(d)12) and 509 of the

---

[22] Applicant produced a study on the effect of the quarry's operation on local traffic, *see* Ex. A-3, the value of which Objectors disputed.

[23] "[W]here a court needs to define an undefined [ordinance] term, it may consult dictionary definitions for guidance." *Sheppleman v. City of Chester Aggregated Pension Fund*, 271 A.3d 938, 949 (Pa. Cmwlth. 2021) (quoting *THW Grp., LLC v. Zoning Bd. of Adjustment*, 86 A.3d 330, 336 (Pa. Cmwlth. 2014)). *See* www.merriam-webster.com/dictionary/assessment (last visited Nov. 18, 2025).

Ordinance, and the Board did not err by accepting Applicant's assessment by way of testimony and other evidence.[24]

Moreover, the Mining Act clearly preempts the subjects addressed in Section 404.G(7)(d)12)a)-c) and e) of the Ordinance. *See Geryville Materials, Inc.*; *see also Warner Co.* This Court recognizes that, in *Arbor Resources*, this Court held that the requirement to submit environmental reports "logically related to the zoning decision of allowing or disallowing the facility *to be located in a particular site* in relation to other components of the . . . landscape" is a traditional land use control.[25] *Id.* at 1046 (emphasis added) (quoting *Klein v. Shadyside Health Educ. & Rsch. Corp.*, 643 A.2d 1120, 1125 (Pa. Cmwlth. 1994)). However, the *Geryville Materials, Inc.* Court observed that ordinances that may be neutral on their face can

---

[24] As the trial court accurately summarized:

> [Applicant's] testimony and reports addressed the topics of groundwater (geologist, Val [F.] Britton), wetlands and surface water (Jason [J.] Mease[, PWS, Valley Environmental Services, Inc.]), floodplain identification analysis ([Timothy] Woodrow[, P.E., Woodrow & Associates]), air quality (Daniel [P.] Dix[, ALL4, LLC]), noise and odor ([] Drumbore), and traffic (Mark [A.] Roth[, P.E., McMahon Associates]). As to soil quality, [Applicant] introduced Exhibit A-2 which contains soil mapping and a Bucks County Soil Survey Types legend. Additional information relating to soils was presented by [Applicant] through testimony and also a project narrative within Exhibit B-l[,] which explains that the site is comprised of soils classified as the Montalto loam series, the Steinburg shaly silt loam[,] and the Watchung silt loam. *See* Ex[.] B-l at 9.

Trial Ct. Op. at 48 (R.R. at 545a).

[25] This Court acknowledges that the preempting state law in *Arbor Resources* was the since-repealed Oil and Gas Act, Act of December 19, 1984, P.L. 1140, *as amended*, 58 P.S. §§ 601.101-601.605; *repealed and replaced by* the Act of February 14, 2012, P.L. 87, No. 13, 58 Pa.C.S. §§ 2301-3504 (58 Pa.C.S. § 3304 declared unconstitutional, null and void in *Robinson Township, Wash. Cnty. v. Commonwealth*, 52 A.3d 463 (Pa. Cmwlth. 2012), *aff'd in part and rev'd in part*, 83 A.3d 901 (Pa. 2013). However, because Section 602 of the Oil and Gas Act contained similar preemption language, *see formerly* 58 P.S. § 601.602, the analyses also apply to Mining Act preemptions. *See Geryville Materials, Inc.*

17

be preempted when the local governing body "turn[s] them into operational regulations . . . that confront every quarry[,]" *id*. at 329, i.e., the Mining Act preempts otherwise neutral ordinances a local governing body construes or applies in a manner that regulates noncoal surface mining. *See id*. This Court has also expressly concluded that a municipality "lack[s] the power to replicate the environmental oversight that the General Assembly has conferred upon DEP . . . ." *Frederick*, 196 A.3d at 697.

Here, the Board concluded that while the Ordinance requires that all uses comply with the environmental protection standards enumerated therein, the Mining Act preempts those standards. *See* COL 42 (R.R. at 25a); *see also* R.R. at 129a-130a. Indeed, based on this Court's review, in addition to its other numerous regulations concerning noncoal mining, Title 25, Subchapters G and I of DEP's Regulations[26] (*see* 25 Pa. Code §§ 77.401-77.410, 77.501-77.655) requires noncoal mining permit applicants to identify environmental resources, including "the geology, hydrology and water quality and quantity of surface waters and groundwaters within the general area, and water which will flow into or receive discharges of water from the general area." 25 Pa. Code § 77.403(a); *see also* 25 Pa. Code §§ 77.404-77.407, 77.521-77.535. A permit applicant must also provide air pollution control and air resources protection plans, with consideration of Chapters 123 and 127 of DEP's Regulations (relating to air and odor contaminants) (*see* 25 Pa. Code §§ 77.455, 77.575, 123.1-123.121, 127.1-127.802), soil erosion and sedimentation control plans (*see* 25 Pa. Code § 77.458), blasting information (*see* 25 Pa. Code §§ 77.561-77.565). Therefore, the Board properly concluded the Mining Act preempts Sections 404.G(7)(d)12)a)-c), e) of the Ordinance and related provisions in Section 509 of the Ordinance.

___

[26] Section 11(a) of the Mining Act authorizes DEP's Environmental Quality Board to promulgate Regulations necessary to carry out the Mining Act's purpose. *See* 52 P.S. § 3311(a).

The Board did not conclude whether the Mining Act preempted the vehicle traffic information requirement in Section 404.G(7)(d)12)d) of the Ordinance or the traffic impact study requirement in Section 404.G(7)(d)14) of the Ordinance at this stage. Importantly, DEP's Regulations do not specifically call for traffic impact studies as part of quarry operations. In addition, although DEP has promulgated Regulations in its environmental protection performance standards relating to operation's vehicle traffic on both haul roads and common use roads, *see* 25 Pa. Code §§ 77.465-77.466, 77.631-77.633, they primarily relate to the conditions of common use roads, rather than a mining use's effect on local traffic. Moreover, traffic impact falls under the category of permissible land use regulation that a local government may undertake because the location of the proposed quarry must be suitable given the probable effects on local traffic. Accordingly, this Court must review Applicant's traffic evidence.

At the hearings, Applicant's manager and engineer, Scott S. Drumbore, P.E. (Drumbore), testified that, based on real-time daily counts obtained from Applicant's current operation across the street in 2019, and taking into account a reduction in the current truck traffic between Applicant's other quarries and the asphalt plant, Applicant did not expect to add more than 52 trips to the weekday morning peak period or more than 10 trips to the afternoon peak period. *See* O.R., 11/10/2020 N.T. at 81; *see also* Finding of Fact (FOF) 48 (R.R. at 9a). He added that traffic generated from the proposed quarry will be what one would normally expect from this sort of operation. *See* O.R., 11/10/2020 N.T. at 85.

Mark A. Roth, P.E. (Roth) of McMahon Associates, who the Board found qualified as an expert in the field of traffic engineering, prepared the trip generation report and TIS Applicant produced in support of its Application. *See* O.R., 8/10/2021 N.T. at 9. He testified at the hearings that he created the trip generation report on March 11, 2020, using information obtained from Applicant's

19

similar quarry operation in Hilltown Township from January through December 2019, Applicant's current asphalt batch plant across from the Property, and the further proposed quarry use, taking into consideration that August to September demonstrated the highest trip generation, and estimated that during peak weekday morning hours, 7:00 a.m. to 9:00 a.m., and peak weekday afternoon hours, 4:00 p.m. to 6:00 p.m. - the times during which commuter travel would also be at its highest - there would be a total of 74 trips during the morning peak and 10 trips during the afternoon peak. *See id*. at 14-15; *see also* R.R. at 1556a-1578a. Roth explained, however, that since the new quarry will eliminate traffic currently traveling from other quarries to the asphalt plant, the net impact would be approximately 60 new trips during peak morning hours and 4 new trips during peak afternoon hours. *See id*. at 15; *see also* R.R. at 1558a. He opined that the proposed use would not have a significant impact on Springfield Street or at its nearby intersection with Route 309, but he would confirm his opinion after he conducted a TIS. *See id*.; *see also* R.R. at 1559a.

Roth also testified regarding how he prepared the TIS in June 2020, using the Pennsylvania Department of Transportation (PennDOT)-adopted Synchro computer analysis system incorporating the Highway Capacity Manual, and 2018 and 2019 data. *See id*. at 15-26. He ultimately estimated in the TIS that there would be a total of 52 new trips during peak morning hours and 10 new trips during peak afternoon hours. *See id*. at 27; *see also* Ex. A-3 at 8; FOF 48 (R.R. at 9a). Roth determined that the affected intersection is a Level of Service A, which has a 6.7 second peak morning-hour delay without the development, which would only extend to 7.4 seconds with development, and the 5 second peak morning-hour delay without development would only increase to 5.3 seconds with development. *See* O.R., 9/14/2021 N.T. at 23-30. Roth maintained that the sight distance at the proposed

20

quarry's driveway exceeds PennDOT's 400-foot requirement. *See* O.R., 8/10/2021 N.T. at 49-50.

Roth concluded that, under such conditions, and considering worst case scenarios, the intersection could withstand a significant amount of additional vehicles without impacting the current times. *See* O.R., 9/14/2021 N.T. at 27-58. Based upon his conclusions, Roth recommended that Applicant create single ingress and stop-controlled egress lanes from the proposed quarry's driveway, and additional curvature access at the intersection. *See* O.R., 8/10/2021 N.T. at 52-54. According to Roth, the traffic that will be generated will be typical for a quarry use, and the proposed site's location is appropriate for such use. *See* O.R., 8/10/2021 N.T. at 60-61; *see also* O.R., 9/14/2021 N.T. at 6. He acknowledged that the TIS was based on the assumption that the proposed quarry's production level would be approximately 500,000 tons per year, and admitted that the TIS did not extend beyond 2023 projections. *See* O.R., 9/14/2021 N.T. at 35-36, 39. Roth added that he made an engineering judgment not to include accident analysis in the TIS. *See id*. at 49-50. Roth opined that the proposed use would not have a significant impact on traffic in the area. *See* O.R., 9/14/2021 N.T. at 37; *see also* FOFs 24, 27-28, 48-58, 165 (R.R. at 7a-10a, 19a).

Clearly, regardless of whether the Mining Act preempted Section 404.G(7)(d)12)d) of the Ordinance, Applicant provided the Township with an environmental impact assessment regarding "[v]ehicle traffic" that included consideration of "the ability of the road system to handle the truck traffic" anticipated by the proposed quarry use at the Property, as that Ordinance prescribed. Ord. § 404.G(7)(d)12)d). Accordingly, the Board did not err by concluding that the Mining Act preempts Section 404.G(7)(d)12)a)-c) and e) of the Ordinance and, thus, Applicant was not required to satisfy those criteria. To the extent Section

21

404.G(7)(d)12)d) is not also preempted by the Mining Act, the Board properly determined that Applicant satisfied the vehicle traffic assessment requirement.

Section 404.G(7)(a)1)a) of the Ordinance

Section 404.G(7)(a)1)a) of the Ordinance mandates:

There shall be a berm[27] of minimum height of 15 feet and maximum height of 50 feet surrounding the entire property site. Berms will be required along existing quarry faces to the extent which the Board . . . determines is feasible. The slope of the sides of the berm shall not exceed a 3:1 ratio. Berms shall be planted and dusted, and erosion control measures shall be taken as may be approved by the [Bucks] County Conservation District. Berms shall begin at a point no closer to a street than the ultimate right-of-way line. No berms shall be constructed closer than 15 feet to a district in which extraction operations are not permitted. Planting of the berms and yard areas shall be sufficient to screen the quarry extraction operations. Both planting and berm construction shall be according to a plan approved by the Board . . . which shall include a reasonable timetable for completion. Such planting shall consist of evergreens of such species and size as will produce, within [three] years, a complete all season visual screen of at least [eight] feet in height.

Ord. § 404.G(7)(a)1)a).

The Board concluded that the Mining Act preempts Section 404.G(7)(a)1)a) of Ordinance because the berm height and location provisions therein relate to surface mining. *See* COLs 32, 40 (R.R. at 24a-25a, 120a-121a). Based on this Court's previous rulings, *see Gibraltar Rock I*;[28] *see also Warner Co.*, and because the berm's placement is clearly "surface activity connected with surface

_____

[27] According to the Board, the "berms serve to reduce noise and dust emissions off site and also provide a visual screen to the operation." FOF 39 (R.R. at 9a).

[28] Objectors claim that their challenge is to the *timing* of the berm's placement, which this Court concluded in *Gibraltar Rock I*, an unreported decision, is not preempted by the Mining Act. However, that decision is not binding on this Court.

22

. . . mining, [that] includ[es] . . . site preparation . . . and construction and activities related thereto," 52 P.S. § 3303, the Board did not err by concluding that the Mining Act preempts Section 404.G(7)(a)1)a) of the Ordinance and, thus, Applicant was not required to satisfy that criteria.

Section 404.G(7)(a)2)b)xiii and (d)15)

Section 404.G(7)(d)15) of the Ordinance specifies that "[i]f blasting will be used, a pre-blast survey shall be conducted of existing conditions of buildings and streets in the vicinity. A copy of such survey shall be submitted to the Township." Ord. § 404.G(7)(d)15). In addition, Section 404.G(7)(a)2)b)xiii of the Ordinance requires an Applicant to provide, *inter alia*, a "[p]lan of operation showing . . . location and typical schedule of blasting machinery-type and noise." Ord. § 404.G(7)(a)2)b)xiii. However, the Mining Act preempts blasting ordinances, *see* O.R., 11/10/2020 N.T. at 88; *see also Tinicum Twp.*, and mere use of the word *location* does not change the clear operational nature of the regulation. Accordingly, the Board did not err by concluding that the Mining Act preempts Section 404.G(7)(a)2)b)xiii and (d)15) of the Ordinance and, thus, Applicant was not required to satisfy that criteria.

Because, at this stage - before the Board rather than DEP - Applicant did not have the burden of proving compliance with preempted environmental protection Ordinance Sections 404.G(7)(d)12) and 509, berm Ordinance Section 404.G(7)(a)1)a), or blasting Ordinance Section 404.G(7)(a)2)b)xiii and (d)15), but nevertheless presented information related to each, the Board did not exempt Applicant from satisfying non-preempted specific, objective criteria nor err by concluding that Applicant had met its burden.

<u>Conditions</u>

Despite that Objectors stated in their Statement of Questions Involved that the trial court erred or abused its discretion by affirming the Board's grant of conditional use approval that relies on preemption of numerous Ordinance provisions while, at the same time, imposing conditions directly implicating the subject matter of the Ordinance provisions claimed to have been preempted, Objectors fail to provide any discussion or legal argument related thereto in their brief. This Court has explained: "When a party's brief, and specifically the argument section of a brief, is bereft of any legal analysis or citation to court decisions relating to the issues an appellant seeks to have an appellate court review, the reviewing court may regard the appellant as having waived his arguments." *Irey v. Dep't of Transp.*, 72 A.3d 762, 770 n.8 (Pa. Cmwlth. 2013); *see also Samuel-Bassett v. Kia Motors Am.*, 34 A.3d 1 (Pa. 2011) (an appellant waives issues not properly developed in his brief). Thus, Objectors have waived that issue.

Notwithstanding, this Court acknowledges that the Board curiously simultaneously determined that the Mining Act preempted Sections 404.G(7)(a)1)a), 404.G(7)(a)2)b)xiii, 404.G(7)(d)12), 15) and 509 of the Ordinance, but declared that "Applicant will comply with the Mining Act with respect to all surface mining

24

activities[,]"[29] and it imposed conditions to ensure that will be the case.[30, 31] FOF 112 (R.R. at 15a); *see also* COL 15 (R.R. at 22a) ("So long as [] Applicant complies with the conditions imposed upon the approval, the proposed use will be suitable for the [Property] with respect to the conservation of natural resources."). Based on this Court's review, rather than reflecting an attempt by the Board to erroneously assert

[29] The Board found that, with the exception of a portion of the internal access drive crossing a floodplain and wetlands area, Applicant's "proposal complie[d] with the natural resource protection standards contained in the [] Ordinance[.]" FOF 66 (R.R. at 11a); *see also* FOF 155 (R.R. at 18a). For that crossing, the Board required Applicant to obtain a special exception. Section 509.2.A(3)(d) of the Ordinance provides that "[s]tream crossings for utilities, driveways and streets" "are permitted in [a] floodplain by special exception provided that they are in compliance with the provisions of the underlying district, conform to all requirements of the . . . Floodplain Ordinance and are not prohibited by any other [O]rdinance[.]" Ord. § 509.2.A(3)(d).

[30] The Board imposed the following environmental conditions on its approval:

> 4. Applicant shall comply with the [] Mining Act, and all other applicable local, state, and federal laws.
>
> 5. Applicant shall comply with the applicable provisions of the [] Ordinance that are not preempted by the Mining Act, including but not limited to those which are requirements of future submissions (i.e., zoning permit, renewals) and not yet applicable to the Application.

R.R. at 31a. The Board also required Applicant to obtain an annual renewal permit in accordance with applicable non-preempted provisions of Section 404.G(7) of the Ordinance, the filing of which shall include pre-blast surveys and blasting complaints formally reported to DEP and/or informally reported to Applicant; all dust, noise, and groundwater/surface water test results and complaints; records of each blast; and updated traffic counts and projections. *See* R.R. at 34a.

[31] The Board imposed the following berm conditions on its approval:

> 21. Applicant shall maintain the plantings and berms as shown in the Application, and subject to any required revisions by [DEP] under Applicant's large non[]coal surface mining permit, at all times to mitigate any impacts of noise and dust associated with the use of the Property.
>
> 22. Applicant shall install improvements that will mitigate noise and dust in the areas along the Property boundaries located on the south and west sides of the Property where the berm is not constructed to reduce the effects of noise and dust from the quarry operation. . . .

R.R. at 33a; *see also* R.R. at 140a-141a.

authority over preempted Ordinances, as Objectors imply, the conditions merely confirm that the Board approved the Application subject to Applicant's compliance (and, in several instances, Applicant's agreement) with the applicable Mining Act provisions and DEP Regulations. Accordingly, this Court finds no error in that regard.

**2. Threat Not Normally Expected from Quarry Use**

Because the Board properly concluded that Applicant met its burden of proving compliance with the Ordinance's non-preempted conditional use criteria, "a presumption ar[ose] that 'the proposed use is consistent with the general welfare of the community.'" *Brookview Solar I, LLC*, 305 A.3d at 1233 (quoting *H.E. Rohrer, Inc.*, 808 A.2d at 1018). The burden then shifted to Objectors "to rebut the presumption by proving that there is a high degree of probability the proposed use will adversely affect the welfare of the community in a way not normally expected from the type of use." *Brookview Solar I, LLC*, 305 A.3d at 1233. The Board concluded that Objectors did not meet their burden.

Objectors generally argue that the Board cherry-picked and arbitrarily and capriciously disregarded their competent evidence that the proposed quarry poses a threat to the health, safety, and general welfare of the community in a way not normally expected from that type of use.[32] To support their position, Objectors point to testimony and documentation the Mining Act preempted the Board from acting upon. However, limiting this Court's review to the sole issue Objectors have raised on appeal that may not be preempted by the Mining Act - traffic - Objectors

---

[32] Objectors' testimony and public comments made clear that local residents object to a quarry use on the Property despite the Township's "legislative determination that the use will not have an adverse impact on the public interest in normal circumstances." *Brookview Solar I, LLC*, 305 A.3d at 1233.

specifically contend that Applicant failed to meet its "burden to ensure that there will not be adverse traffic impacts." Objectors' Br. at 24.

This Court has stated: "An anticipated traffic increase resulting from a proposed use would not on its own defeat a conditional use request." *Joseph*, 16 A.3d at 1217; *see also In re Brickstone Realty Corp.*, 789 A.2d 333 (Pa. Cmwlth. 2001). Rather, "to deny a request for a conditional use, '[t]here must be a high probability that the proposed use will generate traffic patterns not normally generated by [the proposed] type of use and that this abnormal traffic will pose a substantial threat to the health and safety of the community.'" *Joseph*, 16 A.3d at 1217 (quoting *Orthodox Minyan of Elkins Park v. Cheltenham Twp. Zoning Hearing Bd.*, 552 A.2d 772, 774 (Pa. Cmwlth. 1989)).

The Board found credible Drumbore's and Roth's testimony that traffic generated from the proposed quarry will be typical for the use and will not have a significant impact on traffic in the area. *See* FOFs 15 (R.R. at 6a), 47 (R.R. at 9a); *see also* O.R., 11/10/2020 N.T. at 85; O.R., 8/10/2021 N.T. at 60-61; O.R., 9/14/2021 N.T. at 6, 37. Although Objectors raised concerns regarding traffic, they did not produce any evidence to rebut that testimony.[33]

It is well settled that "[t]he [B]oard is the fact[-]finder, with the responsibility for credibility determinations and the weight to be assigned the evidence." *Brookview Solar I, LLC*, 305 A.3d at 1233.

> [T]his Court may not substitute its interpretation of the evidence for that of the [B]oard. It is the function of [the Board] to weigh the evidence before it. The [B]oard is the

---

[33] The Board did not find record support for Objectors' challenge that the TIS and Roth's testimony was flawed because the TIS was prepared in 2020 and updated thereafter projecting only until 2023; Roth's calculations were premised on Applicant removing 500,000 tons of rock from the Property annually, where it could possibly remove 2.5 to 3 times more than that; the TIS does not account for trucks entering to reclaim the South Extraction Area while the North Extraction Area work begins; and the TIS does not include any analysis of accident data.

27

sole judge of the credibility of witnesses and the weight afforded their testimony. Assuming the record contains substantial evidence, we are bound by the [B]oard's findings that result from resolutions of credibility and conflicting testimony rather than a capricious disregard of evidence.

[The Board] is free to reject even uncontradicted testimony it finds lacking in credibility, including testimony offered by an expert witness.

*Appeal of Campbell*, 250 A.3d 1263, 1265 n.1 (Pa. Cmwlth. 2021) (quoting *Taliaferro v. Darby Twp. Zoning Hearing Bd.*, 873 A.2d 807, 811 (Pa. Cmwlth. 2005) (citations omitted)). Because, based on this Court's review, substantial record evidence supported "the Board's findings that result from resolutions of credibility[,]" *id.*, this Court is bound by them.

Moreover, Applicant has agreed to the following traffic-related conditions to alleviate any concerns:

16. Applicant will be financially responsible for any PennDOT required alterations and intersection upgrades to the intersection of Route 309 and Springfield Street that are specifically related to Applicant's Large Non[]Coal Surface Mining operation as a G-7 Quarry use.

17. Applicant shall provide an annual contribution of $1,500[.00] to [the] Township to defray the Township's costs associated with the operation, maintenance[,] and repair for the stop lights located at the intersection of Route 309 and Springfield Street.

18. All quarry related traffic shall be restricted to that portion of Springfield Street west of the proposed quarry entrance and east of [Route] 309[,] except for local deliveries.

19. Applicant shall take measures including installation of signage on the Property and providing operational directions to direct truck traffic away from Mine Road and shall direct trucks to use Springfield Street to Route 309 except for local deliveries.

28

. . . .

34. Applicant will perform widening of the northeast corner of Route 309 and Springfield Street as indicated in the drawing prepared by Wynn Associates, Inc., entitled "Quarry Vehicle Turning Study" dated November 23, 2021 (Hearing Exhibit T-5)[,] subject to the following conditions:

a. Subject to and provided that [PennDOT] issues the appropriate Highway Occupancy Permit ([]HOP[]). If PennDOT does not issue an appropriate HOP permit, then there is no obligation to perform any widening.

b. All work is to be performed within the existing right-of-way on [the] eastern side of northbound Route 309 from Springfield Street extending no more than 50 feet along the existing right-of-way and the existing right-of-way on the northern side of westbound Springfield Street between the bridge abutment closest to Route 309 and Route 309.

c. If permitted by PennDOT, Applicant will relocate the existing traffic light mast arm and support if required, but will not perform any work on or connected with the Springfield Street bridge.

R.R. at 33a, 35a. In light of the Board's credibility determinations and these conditions, and Objectors' general argument that traffic will increase with the proposed use, Objectors failed to meet their burden of proving that the proposed quarry poses a threat to the health, safety, and general welfare of the community in a way not normally expected from that type of use.

## 3. ERA

Finally, Objectors argue that the trial court erred or abused its discretion by affirming the Board's grant of conditional use approval in a manner inconsistent with its duties as trustee under the ERA. Objectors specifically assert that there is

29

no baseline assessment of water quality; the air particulate evidence Applicant provided was from an unreliable air modeler and Applicant offered no evidence of air toxics; and Applicant's evidence reflects deep risk and harm to the public natural resources onsite and on neighboring properties. Objectors claim that the Board impermissibly cherry-picked evidence to support its preferences.

The Pennsylvania Supreme Court has ruled:

To start, the General Assembly derives its power from [a]rticle III of the Pennsylvania Constitution[, PA. CONST. art. III], which grants broad and flexible police powers to enact laws for the purposes of promoting public health, safety, morals, and the general welfare. [*Robinson Twp., Wash. Cnty. v. Commonwealth*, 83 A.3d 901,] 946 [(Pa. 2013) (plurality)]. These powers, however, are expressly limited by fundamental rights reserved to the people in [a]rticle I of our Constitution[, PA. CONST. art. I]. *Id.* . . . Specifically, [s]ection 1 [of Pennsylvania Constitution article I] affirms, among other things, that all citizens "have certain inherent and indefeasible rights." *Id.* at 948 (quoting PA. CONST. art. I, § 1). As forcefully pronounced in [s]ection 25 [of Pennsylvania Constitution article I], the rights contained in [a]rticle I [of the Pennsylvania Constitution] are "excepted out of the general powers of government and shall forever remain inviolate." *Id.* (quoting PA. CONST. art. I, § 25).

Among the "inherent and indefeasible" rights in [a]rticle I of the Pennsylvania Constitution are the rights set forth in the [ERA], which we quote again for ease of discussion:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, § 27. This constitutional provision grants two separate rights to the people of this

30

Commonwealth. The first right is contained in the first sentence, which is a prohibitory clause declaring the right of citizens to clean air and pure water, and to the preservation of natural, scenic, historic[,] and esthetic values of the environment. *Robinson Twp.*, 83 A.3d at 951. This clause places a limitation on the state's power to act contrary to this right, and while the subject of this right may be amenable to regulation, any laws that unreasonably impair the right are unconstitutional. *Id*.

The second right reserved by [s]ection 27 [of Pennsylvania Constitution article I], set forth in its second sentence, is the common ownership by the people, including future generations, of Pennsylvania's public natural resources. *Id*. at 954. . . .

The third clause of [s]ection 27 [of Pennsylvania Constitution article I] establishes a public trust, pursuant to which the natural resources are the corpus of the trust, the Commonwealth is the trustee, and the people are the named beneficiaries. *Robinson Twp.*, 83 A.3d at 955-56. . . .

The *Robinson Township* plurality aptly described the Commonwealth's duties as the trustee of the environmental trust created by the people of Pennsylvania as follows:

> As trustee, the Commonwealth is a fiduciary obligated to comply with the terms of the trust and with standards governing a fiduciary's conduct. The explicit terms of the trust require the government to "conserve and maintain" the corpus of the trust. *See* PA. CONST. art. I, § 27. The plain meaning of the terms conserve and maintain implicates a duty to prevent and remedy the degradation, diminution, or depletion of our public natural resources. As a fiduciary, the Commonwealth has a duty to act toward the corpus of the trust - the public natural resources - with prudence, loyalty, and impartiality.

*Robinson Twp.*, 83 A.3d at 956-57.

31

*Pa. Env't Def. Found. v. Commonwealth*, 161 A.3d 911, 930-32 (Pa. 2017) (footnote omitted). "[A]ll . . . entities of the Commonwealth government, both statewide and local, have a fiduciary duty to act toward the corpus with prudence, loyalty, and impartiality." *Id*. at 932 n.23. Therefore, "[w]hen a municipality enacts a zoning ordinance, it is bound by the [ERA] and by all the rights protected in [a]rticle I of the Pennsylvania Constitution." *Frederick*, 196 A.3d at 695.

> This Court has explained:
>
> The [ERA] "protects the people from governmental action that unreasonably causes actual or likely deterioration" of the public natural resources. [*Robinson Twp.*, 83 A.3d] at 953 . . . . The [ERA] was not intended to "deprive persons of the use of their property or to derail development leading to an increase in the general welfare, convenience, and prosperity of the people." *Id*. at 954. It does, however, require that economic development not take place at the expense of an "unreasonable degradation of the environment." *Id*. . . . Furthermore, with respect to the environment, "the state's plenary police power . . . must be exercised in a manner that promotes sustainable property use and economic development." *Id*. Thus,
>
> > [t]he [ERA] does not call for a stagnant landscape; nor, as we explain [above], for the derailment of economic or social development; nor for a sacrifice of other fundamental values. But, when government acts, the action must, on balance, reasonably account for the environmental features of the affected locale, . . . if it is to pass constitutional muster.
>
> *Id*. at 953. In sum, the [ERA] "do[es] not require a freeze of the existing public natural resource stock; rather, . . . the duties to conserve and maintain are tempered by legitimate development tending to improve upon the lot of Pennsylvania's citizenry, with the evident goal of promoting sustainable development." *Id*. at 958.
>
> The [ERA's] protections may be enforced by citizens bringing suit in the appropriate forum, including the courts. *Id*. at 957.

*Feudale v. Aqua Pa., Inc.*, 122 A.3d 462, 467-68 (Pa. Cmwlth. 2015), *aff'd*, 135 A.3d 580 (Pa. 2016). As the parties challenging the constitutionality of the Ordinance's provisions that are presumed to be valid, Objectors bear the burden of proof, and the Board's judgment controls when the Ordinance's validity is debatable. *See Frederick*.

Section 603(i) of the MPC requires that municipalities "shall provide for the reasonable development of minerals in each municipality" in their zoning ordinances. 53 P.S. § 10603(i). However, because quarries may be less than desirable neighbors, "[z]oning accounts for the 'natural, scenic, historic[,] and esthetic values of the environment[,]' Pa. Const. art. I, § 27[,] . . . by placing compatible uses in the same zoning district[,]" *Frederick*, 196 A.3d at 695, i.e., "regulat[ing] *where* mineral extraction takes place." *Id*. at 697. Here, the Township has legislated that a quarry is permitted as a conditional use in its PI Zoning District if an applicant satisfies the general and specific criteria set forth in Sections 404.G(7), 509, and 802 of the Ordinance.

Although the ERA does not impose express duties on the Township to take specific measures to protect the environment, the Township is aware of and considers the Ordinance's stated purpose

> to control the intensity of development in areas of sensitive natural resources or natural features in order to reduce or eliminate adverse environmental impacts; to protect the people's right to clean air, pure water, and the natural scenic, historic, and aesthetic values of the environment; and to protect natural resources which are part of the ecological system to which we are all bound, and therefore are the common property of all the people, including generations yet to come, and must be protected to insure the health, safety, and welfare of all the people.

Ordinance Section 103.A, Ord. § 103.A. Allowing a quarry use in the PI Zoning District by conditional use "evidences [the Township's] legislative determination

33

that the use will not have an adverse impact on the public interest in normal circumstances." *Brookview Solar I, LLC*, 305 A.3d at 1233; *see also Protect PT v. Penn Twp. Zoning Hearing Bd.*, 220 A.3d 1174, 1185 (Pa. Cmwlth. 2019) (The Township "is presumed to have investigated [whether such use is wise] and ascertained what is best for the good of the people.").

Notwithstanding, the Mining Act preempts the environmental regulation of noncoal surface mining. Importantly, Section 2 of the Mining Act similarly declares:

> Th[e Mining A]ct shall be deemed to be an exercise of the police powers of the Commonwealth for the general welfare of the people of this Commonwealth, to provide for the conservation and improvement of areas of land affected in the surface mining of noncoal minerals, to aid in the protection of birds and wildlife, to enhance the value of the land for taxation, to decrease soil erosion, to aid in the prevention of the pollution of rivers and streams, to protect and maintain water supply, to protect land, to enhance land use management and planning, to prevent and eliminate hazards to health and safety and generally to improve the use and enjoyment of the lands.

52 P.S. § 3302. Therefore, the Mining Act also recognizes that surface mining may impact the environment and directs DEP - not the Board - to mitigate any impacts to the extent possible.

Where, as in this case, the Mining Act preempts the specific environmental criteria with which Objectors take issue in this appeal, the Board cannot have violated the ERA in granting the Application. Applicant's compliance with environmental protection regulations relative to its proposed use are for DEP to decide. Accordingly, the trial court properly determined that Objectors failed to establish that the Board's decision violated the ERA.

**Conclusion**

Based on the foregoing, the trial court's order is affirmed.

_____
ANNE E. COVEY, Judge

Judge Fizzano Cannon did not participate in the decision in this matter.

Spear Products, Inc., Spear Holdings, : 
LLC, Kyle Fliszar, Harold and Ellen : 
Yerkes, Gerald and Mary Anne Claire, : 
and Clean Air Council, : 
                  Appellants : 
                   : 
         v. : 
                   : 
Springfield Township, H&K Group, : 
Inc., and Springfield Township Board :    No. 1627 C.D. 2024
of Supervisors : 

## O R D E R

AND NOW, this 19th day of November, 2025, the Bucks County Common Pleas Court's November 6, 2024 order is affirmed.

_____
ANNE E. COVEY, Judge